1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8  DONALD MCCALLISTER,

9     Petitioner

10  v.

11  BRIAN WILLIAMS,[1] et al.,

12     Respondents.

Case No.: 2:18-cv-01140-JCM-EJY

**ORDER**

13      In the remaining claims in Donald McCallister's 28 U.S.C. § 2254 second

14  amended habeas corpus petition he argues that his trial counsel rendered ineffective

15  assistance in a variety of ways. (ECF No. 27.) Those claims are now before the court for

16  adjudication of the merits. Because McCallister has not demonstrated that his counsel

17  was deficient and that he suffered prejudice, the petition is denied.

18
19
20
21

---

[1] According to the state corrections department's inmate locator page, McCallister is
incarcerated at High Desert State Prison. The department's website reflects Jeremy Bean is the
warden for that facility. At the end of this order, the court directs the Clerk to substitute Jeremy
Bean for prior respondent Brian Williams, under, *inter alia*, Rule 25(d) of the Federal Rules of
Civil Procedure.

## I.     Background

A Clark County (Nevada) jury convicted McCallister of 6 counts of sexual assault of a minor under 14 years of age and 13 counts of lewdness with a child under the age of 14. (Exh. 4, ECF No. 28-4.) The charges stemmed from his time teaching at Paradise Elementary School in Las Vegas, Nevada. Teachers at the at-risk school were heavily involved in students' lives, including helping to ensure that they had basic necessities and conducting home visits to families living in motels. McCallister became particularly involved in helping J.B., who had a troubled home life. J.B. went to live with McCallister when he was 9 years old for about 3 years. Years later, when he no longer lived with McCallister, J.B. said that he realized that McCallister had been sexually abusing him. (*See* ECF No. 27 at 6-9.)

The state district court sentenced McCallister to terms that amounted to life in prison with the possibility of parole after 45 years. *Id.* Judgment of conviction was entered on January 3, 2012. *Id.* The Nevada Supreme Court remanded his state postconviction habeas petition for the district court to consider whether his counsel was ineffective for failing to raise a statute of limitations defense to the lewdness charges. In response, the State dismissed the lewdness charges. (*See* Exh. 15, ECF No. 29-4, Exh. 23, ECF No. 29-12.) An amended judgment of conviction was entered in July 2018.[2] (Exh. 23, ECF No. 29-12.)

Next, McCallister dispatched his original federal habeas petition for filing on or about June 21, 2018. (ECF No. 7.) In September 2018, he filed an appeal of his

---

[2] The dismissal of the lewdness charges did not change the length of McCallister's sentence.

amended judgment of conviction in state court. (Case No. 76869.) This court granted

his motion for appointment of counsel. (*See* ECF No. 6). McCallister filed a counseled,

amended federal petition. (ECF No. 17.) He then filed an unopposed motion to stay in

December 2018 "until the resolution of his state appeal of his first postconviction petition

in the Nevada Supreme Court." (ECF No. 18.) In March 2019, the Nevada Supreme

Court dismissed his appeal because he was not aggrieved by the amended judgment of

conviction. (Case No. 76869.) He moved to reopen his federal case, and he filed a

second amended federal petition in July 2019. (ECF No. 27.) That same day, he filed

another state postconviction petition. (Exh. 180, ECF No. 37-30.) This court ultimately

stayed this action while McCallister litigated the second state petition. (ECF No. 41.)

When the case was reopened respondents filed a motion to dismiss, which the court

granted in part. (ECF No. 52.) The following grounds of ineffective assistance of trial

counsel Paul Wommer remain before this court. McCallister alleges:

> **Ground 2.1**: Trial counsel was ineffective in violation of McCallister's Sixth Amendment rights by failing to object to or raise a statute of limitations defense:
>
> > **Ground 2.1.1**: Trial counsel failed to argue that the 6 sexual assault counts were barred by the statute of limitations.
> >
> > **Ground 2.1.2**: Trial counsel failed to argue that evidence from the 13 barred lewdness counts improperly affected the verdict on the 6 sexual assault counts.
>
> **Ground 2.2**: Trial counsel failed to investigate available witnesses:
>
> > **Ground 2.2.1**: Carolyne Edwards
> >
> > **Ground 2.2.2**: Louis Johnson[3]

---

[3] Ground 2.2.2 is procedurally barred, and this court deferred a determination as to whether McCallister can demonstrate cause and prejudice to excuse the default to the merits adjudication. (ECF No. 52.)

**Ground 2.3**: Trial counsel was ineffective by introducing uncharged allegations.

**Ground 2.4**: Trial counsel failed to reasonably cross-examine the victim.

**Ground 2.5**: Trial counsel failed to object to testimony by a school psychologist and a teacher.

**Ground 2.6**: Trial counsel was incapable of effectively representing McCallister due to brain damage.

**Ground 2.7**: The cumulative effect of trial counsel's ineffectiveness prejudiced McCallister.

**Ground 5**: The cumulative errors violated McCallister's Fifth, Sixth, and Fourteenth Amendment due process and fair trial rights.

(ECF No. 27.)

Respondents have answered the remaining claims and McCallister has replied. (ECF Nos. 66, 69.)

## II.   Legal Standards

### a.   AEDPA Standard of Review

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

4

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

**b.  Ineffective Assistance of Counsel**

Ineffective Assistance of Counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the

6

Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*,

466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

### III.    Trial Testimony[4]

**J.B.**

J.B. was 25 years old when he testified at McCallister's trial. (Exh. 79 at 34-89, 95-126, ECF No. 79-15.) J.B. was a  9 or 10 year old fourth-grade student at Paradise Elementary School when he met McCallister, a 24 year old campus monitor and classroom aide. He liked McCallister and sought out his help because his mother was a drug addict, he didn't get along with his stepfather, and he was getting picked on at school. After a meeting with J.B., his mother, McCallister and the principal, McCallister and his mother reached some agreement that McCallister would help with J.B. McCallister designed a plan and J.B. would be rewarded for good behavior and performance in school. One of the rewards was attending Las Vegas Thunder NHL hockey games; J.B. became a big fan. J.B. started playing, and McCallister bought him hockey gear. McCallister lived at his mother's house, and when they attended games that ended late at night J.B. started staying over. J.B. voluntarily slept in McCallister's bed because it felt "comfortable," and he trusted McCallister. *Id.* at 49-50. J.B. once

---

[4] The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering McCallister's claims.

overheard an argument between McCallister and his mother; she was upset that J.B. was sleeping in McCallister's room.

One night at the mother's house when J.B. was still in fourth grade, McCallister made him fondle McCallister's penis, lick his testicles and perform oral sex on him. McCallister also would also perform the same acts on J.B. J.B. said this happened "easily once a week" while he was in fourth grade. McCallister told J.B. that if he told anyone McCallister would leave him. J.B. didn't want him to leave because McCallister took care of him. Once J.B. was lying on his bed doing homework when McCallister rested his penis on J.B.'s butt and asked if he could put his penis inside J.B.'s butt. J.B. said no; McCallister didn't do anything further.

The sexual contact continued; J.B. would feel angry, though he didn't know why. He started hitting and punching McCallister at times. In addition to hockey gear, McCallister bought him food, clothing, and almost anything he wanted, including expensive shoes like Air Jordan's and Tony Hawk's. J.B. recalled a time when McCallister bought him new goalie pads from a hockey shop where they'd become regulars. When they returned to the car, McCallister asked him, "Do you like your new goalie pads, Bubba?" J.B. said yes, and then McCallister had him perform sex acts. Another time McCallister bought J.B. his favorite player's jersey. When they got home J.B. performed oral sex on McCallister at McCallister's direction.

J.B. and McCallister subsequently moved into a two-bedroom apartment. J.B. slept in McCallister's bed. They engaged in sex acts in bed and in the bathroom. They later lived in McCallister's mother's boyfriend Randy Pollard's house, where J.B. slept in McCallister's bed. When they lived with McCallister's girlfriend Elizabeth Dixon,

McCallister sometimes slept in J.B.'s bed and sometimes slept in Dixon's bed. J.B. performed oral sex on McCallister in bed and in a closet. J.B. denied it when Dixon once asked him if McCallister had been doing anything to him. He also denied it when the moms of two friends he'd play with asked him the same thing. The sexual acts continued with about the same frequency when J.B. was in fifth and sixth grade. J.B. was still playing hockey. He began acting out more violently.

After J.B.'s sixth grade year, McCallister moved to the Lake Tahoe area. J.B. had been staying with the Galors, a hockey family, and they were going to drive him to live with McCallister. When they were going to go, J.B. got angry. He took his belongings out of the car and told the mom that he didn't want to go. He didn't tell the Galors what was happening with McCallister because he felt McCallister was sick and didn't want McCallister to harm them. J.B. lived with a different hockey family for awhile, then moved to Colorado to live with the Galors and play hockey. He never had any further contact with McCallister.

At some point, J.B.'s mother and sister moved to Colorado; he lived with them. Around 2006, J.B. was thinking frequently about McCallister's actions and was having problems at school as well as issues with anger, depression, and difficulty sleeping. He said he finally told his mother at that point because he wasn't scared anymore. She told him he needed to tell the police; he didn't want to tell the police or anyone else. He finally did tell police because he didn't want it to happen to other kids.

On cross-examination J.B. agreed that he had been involved in playground fights in elementary school and had a lot of anger. He said it was both he and McCallister's idea that he should live with McCallister. J.B. recalled taking a camping trip to a national

park with McCallister and McCallister's sister and her husband. He and McCallister slept in McCallister's truck, and the couple slept in a tent. He and McCallister had sexual contact in the truck at night during the trip. He recalled a time when he struck McCallister with a hockey stick across the chest. He didn't really remember specifically what he was angry about at the time but remembered that he had been angry.

**Don McCallister**

McCallister testified that he met J.B. at Paradise Elementary when he was in the fourth grade, age 8 or 9. (Exh. 80 at 198-260, ECF No. 35-10; Exh. 82 at 18-49, ECF No. 35-12.) J.B. was extremely aggressive and would get in fights at school. J.B. asked him for help at one time and McCallister told him he couldn't because he wasn't a resource student assigned to McCallister. In a meeting with J.B., his mother, McCallister, and the principal after a fight, J.B.'s mother said she needed help with her son. The principal asked McCallister if he felt that he could help, and he said yes. He put together the same behavior plan based on a points system that he had used with other students. J.B.'s best friends were brothers who went to events with a married couple who were both teachers at the school; McCallister had heard that they spent the night sometimes. J.B. asked whether he could do the same thing. When J.B. earned it, based on school performance and behavior, McCallister started taking him to Thunder hockey games. They would finish late at night sometimes, and J.B.'s mother was not always at home. McCallister lived with his mother, and he started taking J.B. home with him for the night. Sometime in March or April 1997 he approached J.B.'s mother about having some sort of parental consent agreement. They signed an agreement giving him

parental consent and durable power of attorney to make medical and dental decisions on J.B.'s behalf.

In January 1998 McCallister and J.B. moved into an apartment, so that J.B. could attend a middle school where a lot of his hockey friends went. J.B.'s mom had told McCallister from the beginning that J.B. would have nightmares and was a restless sleeper. When J.B. would have nightmares, he'd go into McCallister's room, get into bed and fall back asleep. McCallister would go to J.B.'s room or sleep on the floor.

There were scheduling problems with hockey when J.B. would have to go back to his mom's; he did not go willingly. For a period of time J.B. was doing well in school. Then they moved to Randy Pollard's house; J.B. had to change middle schools and was upset about leaving his friends. His grades dropped, and McCallister told him he was going to have to stop playing hockey. They had that conversation one night, and McCallister woke up the next morning to J.B. breaking a hockey stick across his back. He testified that no sexual misconduct or inappropriate touching ever occurred between he and J.B. McCallister said that when he would hug J.B. it was a big brother-little brother type hug and absolutely not a passionate or amorous hug.

McCallister acknowledged that in 2007 he told police that J.B. had come to stay with him when J.B. was in the fourth grade, but at the 2011 trial he said J.B. had been in fifth grade. He said after some period of time he would hug J.B. at times; he did not recall ever kissing J.B. McCallister said he did not think there was anything wrong with J.B. at age 9 crawling into bed with 24 year old McCallister when J.B. had nightmares. He agreed that his mother essentially told him she didn't want anything to do with the situation as long as he had J.B. living with him. When asked about his police interview,

McCallister said he had told the detective that J.B. never came into his room because she was questioning him aggressively. He said the detective had told him over the phone that the interview would be about J.B., which contradicted the detective's testimony that she never had a prior conversation with McCallister about the subject of the interview. He reviewed his interview and agreed that initially he told the detective that he didn't know why he was there and then that it was he who brought up the fact that he had cared for J.B. for 3 years. McCallister agreed that his mother told him that it wasn't right that J.B. would sleep in bed with him. Regarding punishment, he said he would never spank, or hit or physically touch J.B. and that he wouldn't have wanted to risk charges that he was physically abusive. At trial he said he did not discuss sexual matters with J.B. because he thought that information should come from a parent. But he told police that he did not discuss the subject with J.B. because he didn't want to wind up with sexual abuse charges. He told police that he was only concerned about J.B. being in his bed because society kept telling him what he was doing was wrong. He said when J.B. was 12 years old, he begged Elizabeth Dixon to let J.B. come live with her because then he could return to his former middle school.

He acknowledged that he told police that when they lived at Dixon's house he and J.B. shared a bedroom. He also told police he was in a sexual relationship with Dixon when he lived there. McCallister said he spent a significant amount of money on hockey for J.B.; he told police that he racked up about $8,500 in credit card debt.

He told police that on the camping trip J.B. had testified about they actually were driving back from Arizona and hadn't intended to camp but it got late. He said J.B. slept in the back seat and he slept in the front seat of his truck. At trial he said he was

confused when the police questioned him and that J.B. hadn't been on that trip. He told police that J.B. was lying because he was upset that McCallister sent him back to live at home.

**Shirley Syphus**

The State subpoenaed McCallister's mother, Shirley Syphus. (Exh. 79 at 172-214, ECF No. 79-15.) She agreed that J.B. would spend the night at her house after late hockey games when no one was home at J.B.'s house. She said J.B. always slept in the spare bedroom and that they all slept with the bedroom doors open. McCallister told her that J.B. would have nightmares and would end up sleeping in McCallister's room. She acknowledged that in her statement to police she said, "We always had to mention to him, you know. Well, and that's not a good thing." (*Id.* at 184.) J.B. eventually came to live at her house. Syphus usually was not at her house at night because she would go to her boyfriend Randy Pollard's house about 10 or 10:30 at night when he finished working swing shift. Syphus described J.B. as a "little angel" when he first started coming over but said as time went on J.B. acted increasingly angry. (*Id.* at 187-188.) During the time period that J.B. was beginning to act violently, McCallister was buying him expensive items, including hockey equipment, shoes, and clothing.

Syphus paid the rent when McCallister and J.B. moved into a place at Casablanca apartments. Later Pollard moved in with Syphus, and McCallister and J.B. moved into Pollard's house. An incident occurred at Pollard's house where J.B. struck McCallister with a hockey stick, so they were not allowed to continue to live there. McCallister and J.B. moved to McCallister's girlfriend house.

**Rebecca Yost**

J.B.'s mother, Rebecca Yost, testified that when J.B. started at Paradise Elementary, the family had had to move due to financial strain; her older twins had turned 18 and she no longer received child support, and she worked long hours. (Exh. 79 at 127-163, ECF No. 79-15.) Her then-boyfriend was an addict and abused her, and she also became a drug addict. When she had to meet with the principal and McCallister when J.B. got into trouble at school, she and McCallister discussed that he might be able to help out with J.B. Yost thought it would be good for her son to have a positive male role model. McCallister spent more and more time with J.B., playing and watching hockey, going to the park and movies, and working on schoolwork.

J.B. moved in with McCallister; Yost gave McCallister durable special power of attorney for dental and medical care for J.B. when necessary. (*See id.* at 160.) He lived with McCallister from about age 9 to age 12. Yost and her daughter later moved to Fort Collins, Colorado in about 2005 to be with J.B. They reconnected as mother and son; he stayed with her sometimes but mostly lived in an apartment with his girlfriend. In 2006, J.B. was having problems sleeping, concentrating, and was acting oddly. Yost asked him repeatedly if something was wrong, and he finally told her that McCallister had been molesting him. She contacted police in Fort Collins. J.B. gave a statement to police in November 2006.

**Jerrod Kinsman**

Sergeant Jerrod Kinsman testified that he was with the Fort Collins Police Department. (Exh. 79 at 164-172, ECF No. 79-15.) In November 2006, when he was a detective in the Crimes Against Persons Unit, a Las Vegas Metropolitan Police

Department detective requested that Kinsman interview J.B. regarding a sexual assault investigation. J.B. eventually came to the police station for an interview. His demeanor was scared, nervous, shaken, and became more so as he spoke with Kinsman. J.B. essentially cried during the entire interview.

**Kim Bozek**

School district psychologist Kim Bozek was a teacher at Paradise at the time in question and worked with and knew McCallister. (Exh. 80 at 30-52, ECF No. 35-10.) J.B. loved hockey; McCallister helped him start to play and paid for it. University of Nevada Las Vegas would give the school free tickets, and staff would walk across the street from the school with the kids to games. She recalled J.B. attending Thunder games with McCallister. J.B.'s father was in prison, his mother was a drug addict, and she saw his grandmother maybe once or twice. His three closest friends had much more stable family lives. J.B. was close to McCallister. She knew J.B. lived with McCallister. She said she was motherly toward her students in the classroom, and she had never had a student sleep at her house because "it gives the appearance of inappropriate, no matter how right or wrong it is." (*Id.* at 41.) She had some concerns about the living arrangements, and she told McCallister she thought it was silly. When she taught J.B. he had a lot of anger and bitterness issues. She never saw any inappropriate behavior on McCallister's part with any student and J.B. never gave her any indication that there was any sexual contact. She told McCallister she thought he needed to be really careful about what he was doing. She said he wore his heart on his sleeve, that the kid needed help and that's what he was doing. She told him "You do

what you want, but it's going to come back to bite you in the butt one day, and I hope it doesn't." (*Id.* at 51-52.)

**Steven Rock**

Steven Rock testified that he also taught at Paradise at the time. (Exh. 80 at 52-73, ECF No. 35-10.) McCallister was an assistant in his classroom; he emphasized that McCallister's work was proactive and exceptional. Rock mostly knew J.B. from the playground, where he stuck out as always wanting to be in charge. J.B. was never violent but would have conflict and go off pouting. He would see McCallister and J.B. at hockey games. He did not know J.B. lived with McCallister until after the fact. Rock never had a student sleep over because, "In college I was taught that, you know, there's certain lines you shouldn't cross as a professional educator," and having a student sleep over crossed that line. (*Id.* at 62.) He described heavy involvement by the staff with the students' lives, including buying necessities, arranging for families to be adopted for Christmas, moving furniture, cleaning apartments. He'd do home visits to the students living in weekly motels. He observed McCallister giving J.B. guidance as a type of big brother.

### IV.   Discussion

**Ground 2.1**

McCallister argues that trial counsel was ineffective for failing to argue: that the 6 sexual assault counts were barred by the statute of limitations (ground 2.1.1); and that evidence from the 13 barred lewdness counts improperly affected the verdict on the 6 sexual assault counts (ground 2.1.2). (ECF No. 27 at 37-49.)

The Nevada Supreme Court disagreed:

We agree with the district court that McCallister did not demonstrate deficient performance as to the charges of sexual assault of a minor under 14 years of age because there was no viable statute-of-limitations defense to those charges based on NRS 171.095(1) (1993)[FN1] and NRS 171.083(1). *See also State v. Quinn*, 30 P.3d 1117, 1121-22 (Nev. 2001) (discussing "discovery" for purposes of NRS 171.095(1)(a)); *Winstrom v. State*, 752 P.2d 225, 228 (Nev. 1998) (discussing when sex offense involving a minor is committed in a "secret manner"), overruled on other grounds by *Hubbard v. State*, 920 P.2d 991 (Nev. 1996). In particular, we agree that the victim filed a police report within the meaning of NRS 171.083(1) in November 2006 and, as a result, that statute removed the limitations period for commencing a prosecution on the sexual assault charges.[FN2] We disagree, however, with the district court's assessment of this ineffective-assistance claim as to the charges of lewdness with a child under 14 years of age because NRS 171.083(1) is limited to "sexual assault" and thus did not remove the limitations period for commencing a prosecution on the lewdness charges. *See Bailey*, 91 P.3d at 598 (reviewing statute for its plain language where words have an ordinary meaning); *cf.* NRS 171.095(1)(b) (referring to "any offense constituting sexual abuse of a child, as defined in NRS 432B.100," which includes lewdness). It further appears that the prosecution for the lewdness charges was not commenced within the applicable limitation period even considering the longest period afforded by NRS 171.095. Although we acknowledge that it is unlikely that counsel could have had a sound strategic reason for failing to raise a statute-of-limitations defense to the lewdness charges, *see People v. Harris*, 43 N.E.3d 750, 753 (N.Y. 2015) (holding "there could have been no strategic purpose for failing to raise the statute of limitations as against the time-barred charge"); ABA Criminal Justice Standards for the Defense Function, 4-5.1(b) (4th ed. 2015), we conclude that an evidentiary hearing is necessary for a final determination as to whether counsel's performance fell below an objective standard of reasonableness.[FN3]

[FN1]: At all pertinent times in these proceedings, NRS 171.095(1) applied as amended in 1993. See 1993 Nev. Stat., ch. 177 § 1, at 305-06; *Bailey v. State*, 91 P.3d 596, 597 (Nev. 2004) (explaining that limitations period is that in effect at the time of the offense).

[FN2]: We note that NRS 171.083 applied to each count of sexual assault because the Legislature expressly intended the statute to apply to sexual assaults committed before its effective date where the statute of limitations had not yet run. 1997 Nev. Stat., ch. 248, § 4, at 891; *see State v. Merolla*, 686 P.2d 244, 246 (Nev. 1984).

[FN3]: The deficiency prong is crucial here because it is clear that, if counsel's performance was deficient, McCallister can demonstrate prejudice with respect to the lewdness convictions—a successful statute-of-limitations defense would have barred a trial on the lewdness charges. We do not believe, however, that McCallister can demonstrate prejudice as to the sexual assault convictions had trial counsel successfully precluded a trial on the lewdness charges.

(Exh. 15 at 3-4, ECF No. 29-4.)

McCallister then re-raised these claims in his second state postconviction petition. (Exh. 180, ECF No. 37-30; Exh. 199, ECF No. 46-17.) The Nevada Supreme Court held that the claims were procedurally barred because McCallister had already raised them in his appeal of the denial of his first state postconviction litigation and that he failed to demonstrated cause and prejudice to overcome the procedural default:

McCallister next argues that trial counsel should have challenged his charges for lewdness with a child as barred by the statute of limitations. He argues that he has good cause to raise this issue again in an untimely petition because the district court did not properly resolve it on remand in the first postconviction proceeding. In the prior postconviction appeal involving McCallister's first postconviction habeas petition, this court remanded for the district court to conduct an evidentiary hearing limited to whether trial counsel's omission in this regard constituted ineffective assistance. On remand, the State moved to dismiss the lewdness counts. McCallister argued that the district court had to hold an evidentiary hearing, and he filed a motion for a new trial or an evidentiary hearing, which the district court denied.[FN2] The district court subsequently entered an amended judgment of conviction, removing the lewdness counts.[FN3] The district court apparently did not enter a separate order formally denying the ineffective-assistance claim in the first petition. Even if that omission by the district court provides good cause for McCallister to relitigate this ineffective-assistance claim, McCallister does not show actual prejudice. McCallister no longer stands convicted of or under sentence of imprisonment for the lewdness charges. And contrary to McCallister's suggestions, even if the district court had held an evidentiary hearing on remand in the first postconviction proceeding, that hearing would have been limited to the single ineffective-assistance claim related to the statute of limitations for the lewdness charges. That was the only claim included in this court's remand, as this court held that McCallister's other claims lacked merit. *McCallister II*, Docket No. 68445. The remand therefore did not open the door for McCallister to relitigate any of the claims that had been rejected or allow

20

him to present or the district court to consider new claims. *See LoBue v. State ex rel. Dep't of Highways*, 554 P.2d 258, 260 (Nev. 1976) (concluding that the district court erred when it considered issues beyond the scope of a limited remand). Insofar as McCallister asserts that the outcome at trial might have been different if the lewdness charges had been dismissed pretrial based on the statute of limitations, we disagree. The State presented overwhelming evidence of the sexual assaults. And, the conduct underlying the lewdness charges would have been admissible regardless of whether McCallister was charged with lewdness because it occurred in the "same transaction" as the sexual assaults and was therefore relevant to a full and accurate account of the sexual assaults. *See* NRS 48.035(3); *Bellon v. State*, 117 P.3d 176, 181 (Nev. 2005) (discussing res gestae); *Allan v. State*, 549 P.2d 1402, 1403 (Nev. 1976) (holding that evidence constituting lewdness was admissible under res gestae where the acts occurred in the immediate context of the sex crimes charged as part of the "same transaction"). Because McCallister has not shown actual prejudice in this regard or any other, the district court did not err in denying the claim as procedurally barred.

[FN2]: This court dismissed in part and affirmed in part the district court's decision. *McCallister v. State*, Docket No. 73261 (Order Dismissing Appeal in Part and Affirming in Part and Directing Entry of Amended Judgment of Conviction, June 15, 2018).

[FN3]: This court dismissed McCallister's appeal from the amended judgment of conviction because he was not aggrieved by the amendment. *McCallister v. State*, Docket No. 76869 (Order Dismissing Appeal, March 8, 2019).

(Exh. 212 at 3-5, ECF No. 46-30.)

The state supreme court then further addressed McCallister's claim that his counsel should have challenged the sexual assault charges on statute of limitations grounds:

McCallister next argues that trial counsel should have raised a statute-of-limitations challenge to the sexual assault charges. He argues that the victim never filed a written police report within the meaning of NRS 171.083(1) to remove the limitations period. The district court rejected the same claim raised in the first postconviction petition, and this court affirmed that decision on appeal. *McCallister II*, Docket No. 68445. The doctrine of the law of the case bars relitigation. We decline McCallister's invitation to reconsider our prior decision, as it was not clearly erroneous and the record repels his contention that the victim did not adequately report the crimes in

light of NRS 171.083(1). *See Hsu v. Cty. of Clark*, 173 P.3d 724, 729 (Nev. 2007) (recognizing exceptions to the doctrine of the law of the case that have been adopted by federal courts). Thus, there was no good cause to litigate the claim again, *see* NRS 34.810(2), (3), and the district court did not err in denying this claim.

(Exh. 212 at 5-6, ECF No. 46-30.)

**Ground 2.1.1: The Nevada Supreme Court was not unreasonable in concluding that counsel was not ineffective for failing to raise a non-viable statute of limitations challenge.**

At the time of McCallister's offenses, NRS 171.085 prescribed a four-year statute of limitations for sexual assault charges. NRS 171.095 extended the statutory period for when a secret sexual crime against a child was "discovered":

1.  Except as otherwise provided in subsection 2:

    (a) If a felony, gross misdemeanor or misdemeanor is committed in a secret manner, an indictment for the offense must be found, or an information or complaint filed, within the periods of limitation prescribed in NRS 171.085 and 171.090 after the discovery of the offense unless a longer period is allowed by paragraph (b).

    (b) An indictment must be found, or an information or complaint filed, for any offense constituting sexual abuse of a child, as defined in NRS 432B.100, before the victim of the sexual abuse is:

        (1) Twenty-one years old if he discovers or reasonably should have discovered that he was a victim of the sexual abuse by the date on which he reaches that age; or

        (2) Twenty-eight years old if he does not discover and reasonably should not have discovered that he was a victim of the sexual abuse by the date on which he reaches 21 years of age.

The Nevada Supreme Court has further held that secret sexual abuse of a child is "discovered" under NRS 171.095 when:

[Any] person other than the wrongdoer has knowledge of the act and its criminal nature, unless the person with the knowledge:

> (1) Fails to report out of fear induced by threats made by the wrongdoer or by anyone acting in pari delicto with the wrongdoer; or
>
> (2) Is a child-victim under years of age who fails to report for the reasons discussed in *Walstrom v. State*.[5]

*State v. Quinn*, 30 P.3d 1117, 1118 (Nev. 2001). In *Walstrom*, the court discussed "threats…subtle persuasion, or bribes" by the wrongdoer, as well as the child's fear of not being believed were he to report the abuse. *Walstrom*, 752 P.2d at 228. The court has also held that where such forces prevent discovery of secret sexual abuse, such abuse is nonetheless discovered, at the very latest, when the victim reaches 18 years-old. *Houtz v. State*, 893 P.2d 355, 357 (Nev. 1995). If a victim of sexual assault or a person authorized to act on behalf of a sexual assault victim files a written report of the assault with a law enforcement officer, the limitations period in NRS 171.085 and 171.095 is removed and there is no limitation of the time within which a prosecution for the sexual assault may be commenced. NRS 171.083(1).

Here, the state district court found that the crimes were committed in secret and thus were deemed "discovered" on April 17, 2004, when J.B. turned 18 years old. (Exh. 137, ECF No. 36-27.) The court found that a report was filed with law enforcement in November 2006, which was within 3 years after discovery (or before the victim turned 21 years old). Thus, the court held that a claim that the statute of limitations barred the sexual assault charges was unlikely to succeed, and counsel was not objectively unreasonable for failing to raise the claim. The Nevada Supreme Court agreed. (Exh. 15 at 3-4, ECF No. 29-4; Exh. 212 at 5-6, ECF No. 46-30.)

---

[5] *Walstrom v. State*, 752 P.2d 225 (Nev. 1988), overruled in part on other grounds by *Hubbard v. State*, 920 P.2d 991 (Nev. 1996).

McCallister does not challenge the secret nature of the acts committed. He argues that no evidence was presented that J.B. filed a written report in November 2006, and therefore, the Nevada Supreme Court erred in finding an exception to the limitations period applied here. The court notes that the statute of limitations determination is a state-law question. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Loeblein v. Dormire*, 229 F.3d 724, 726 (8th Cir. 2000) ("a state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute"). Moreover, J.B.'s mother testified that she went to the LVMPD, and Officer Kinsman testified that J.B. went to the Fort Collins Police Department and gave Kinsman a recorded statement in November 2006. (Exh. 79 at 152, 168-169, ECF No. 79-15.) "A federal court may not second-guess a state court's factual finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004), overruled on other grounds by *Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

McCallister also points to J.B.'s testimony that he knew McCallister's actions were wrong when he was 16 years old and he kissed a girl and "it felt right."[6] (Exh. 79 at 86, ECF No. 79-15.)  But J.B. also testified that he told his mother in 2006 about the abuse because he finally wasn't scared anymore. His testimony as a whole reflects that he lacked any stability at home and was always fearful of losing any kind of caretaker.

---

[6] The court notes that McCallister's argument here is also unavailing because he argues that if J.B. discovered what happened when he was 16 years old, the statute of limitations ran when he was 20 in 2007, but the complaint wasn't filed until 2008. However, the event that triggered the exception from the statute of limitations is when J.B. made his statement to officer Kinsman in November 2006.

He testified specifically that he didn't tell other caretakers because he was afraid that McCallister would hurt them. The Nevada Supreme Court's conclusion that trial counsel was not ineffective for failing to argue that the sexual assault charges were barred by the statute of limitations because there was little chance of prevailing is entitled to deference under AEDPA. McCallister has failed to demonstrate that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d). The court denies habeas relief as to ground 2.1.1.

**Ground 2.1.2: The Nevada Supreme Court was not unreasonable in concluding that counsel was not ineffective when he failed to raise the statute of limitations argument as to the lewdness counts because evidence of the time-barred lewdness counts improperly affected the verdict on the 6 sexual assault counts.**

McCallister contends that if his trial counsel raised a statute of limitations defense as to the lewdness charges, all lewdness counts would have been dismissed, and the jury never would have heard evidence of these acts. (ECF No. 27 at 47-49.) As recounted above, in affirming the denial of this claim as procedurally barred, the Nevada Supreme Court also explained that the conduct underlying the lewdness charges would have been admissible regardless of whether McCallister was charged with lewdness because it occurred in the "same transaction" as the sexual assaults and was therefore relevant to a full and accurate account of the sexual assaults.

In *Allan v. State*, the defendant was convicted of a charge related to a single sex act stemming from an evening when 3 minor boys came to his residence. 549 P.2d 1402, 1403 (Nev. 1976). They all watched a pornographic movie. Afterwards, the defendant performed oral sex on two of the boys and had them perform oral sex on him. The defendant then masturbated in front of them. On appeal the defendant argued that

the trial court erred in permitting the boys to testify that he masturbated in their presence after the other sexual acts were completed, as such conduct was evidence of another (uncharged) crime, *i.e.*, lewdness with a minor. But the court held that testimony about the other acts was admissible as part of the res gestae of the crime charged because the acts were part of the same transaction and complete the story of the crime charged by proving the immediate context of happenings near in time and place. *See* NRS 48.035(3); *Bellon v. State*, 117 P.3d 176, 181 (Nev. 2005) (discussing res gestae).

Under state law, the lewdness acts were admissible as the prelude to the sexual assault charges. *Id*. The Nevada Supreme Court's holding on this state evidentiary law question binds this court. The court also notes that J.B. consistently described the acts that gave rise to the lewdness charges as leading up to the acts that gave rise to the sexual assault charges. He characterized all of it as what he and McCallister would routinely do at night before they went to sleep. Because the conduct underlying the lewdness charges would have been admissible to prove the sexual assault charges, it would have been futile for trial counsel to object to this evidence. Failure to take futile or meritless action does not constitute deficient performance. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance"); *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). So the Nevada Supreme Court's holding that trial counsel was not ineffective for failing to argue that the evidence that gave rise to the barred lewdness charges was improperly admitted is entitled to deference under AEDPA. The court notes that substantial evidence also supported the sexual assault counts. McCallister has not shown deficiency or prejudice, so he has failed to demonstrate that the Nevada Supreme Court's decision was contrary

26

to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d). Habeas relief is therefore denied as to ground 2.1.2.

**Ground 2.2**

McCallister contends that trial counsel ineffectively failed to investigate available witnesses Carolyne Myers (a.k.a. Edwards)[7] (ground 2.2.1) and Lois Johnson (ground 2.2.2)[8] (ECF No. 27 at 49-58.) Edwards was the principal of Paradise part of the time McCallister was there, and Johnson was the office manager.

In affirming the dismissal in part of McCallister's first state postconviction petition, the Nevada Supreme Court held that trial counsel was not ineffective for failing to call Edwards to testify:

> …McCallister argues that trial counsel should have called his supervisor to testify as to his good character, his virtues as an employee, and that other teachers had hosted students overnight. McCallister has not shown deficient performance because other witnesses testified to the same matters and therefore the supervisor's testimony would have been cumulative. *See Elam v. Denney*, 662 F.3d 1059, 1065 (8th Cir. 2011) (observing that the "failure to present cumulative evidence does not constitute ineffective assistance of counsel) (quotation marks omitted); *Lara*, 120 Nev. at 180, 87 P.3d at 530.

(Exh. 15 at 4-5, ECF No. 29-4.)

McCallister raised this claim again in his second state postconviction petition, and additionally raised the claim that counsel should have called Johnson to testify. (Exh. 180, ECF No. 37-30.) The Nevada Supreme Court rejected his attempt to

---

[7] The Nevada Supreme Court refers to Carolyne Myers by her maiden name, Edwards, and this court does the same.

[8] Ground 2.2.2 is procedurally barred, and this court deferred a determination as to whether McCallister can demonstrate cause and prejudice to excuse the default to the merits adjudication. (ECF No. 52.)

relitigate the Edwards claim and held that he failed to demonstrate cause and prejudice to overcome the procedural default of the Johnson claim:

> McCallister first argues that trial counsel should have investigated two potential witnesses, Ms. Edwards and Ms. Johnson. Part of this ineffective-assistance claim—the failure to investigate Ms. Edwards—was raised in McCallister's first postconviction habeas petition. This court affirmed the district court's decision rejecting the claim in that petition. *McCallister II*, Docket No. 68445. Relitigation of that part of the ineffective-assistance claim therefore is barred by the law of the case, which "cannot be avoided by a more detailed and precisely focused argument subsequently made after reflection upon the previous proceedings." *Hall v. State*, 535 P.2d 797, 798-99 (Nev. 1975). McCallister has not demonstrated good cause for relitigating the claim in an untimely petition. As to the new aspect of this ineffective-assistance claim (counsel's failure to investigate Ms. Johnson), McCallister asserts that trial counsel knew of Ms. Johnson at the time of trial, which means this claim could have been raised in his first, timely postconviction habeas petition. McCallister has not shown good cause for his failure to do so. The district court therefore correctly applied the mandatory procedural bars. *See State v. Eighth Judicial Dist. Court (Riker)*, 112 P.3d 1070, 1074 (Nev. 2005).

(Exh. 212 at 3, ECF No. 46-30.)

**Ground 2.2.1: The Nevada Supreme Court reasonably concluded that counsel was not ineffective for failing to investigate and present the testimony of Carolyne Edwards.**

McCallister argues that if his counsel had spoken to Edwards, counsel would have learned that McCallister's agreement to allow J.B. to stay at his home was in line with the school's philosophy of treating students like family and wasn't out of the ordinary—in direct contradiction to Steven Rock's testimony, which implied that it was completely unprofessional and inexcusable. (ECF No. 27 at 50-56.) Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In ineffective-assistance-of-counsel cases, "a particular decision not to investigate must be directly

1  assessed for reasonableness in all the circumstances, applying a heavy measure of

2  deference to counsel's judgments." *Id.*

3      The Nevada Supreme Court held that Edwards' testimony was cumulative so

4  McCallister couldn't show prejudice.

5          McCallister argues that trial counsel should have called his
supervisor to testify as to his good character, his virtues as an employee,

6  and that other teachers had hosted students overnight. McCallister has
not shown deficient performance because other witnesses testified to the

7  same matters and therefore the supervisor's testimony would have been
cumulative. *See Elam v. Denney*, 662 F.3d 1059, 1065 (8th Cir. 2011)

8  (observing that the "failure to present cumulative evidence does not
constitute ineffective assistance of counsel") (quotation marks omitted);

9  *Lara*, 87 P.3d at 530.

10  (Exh. 15 at 4-5, ECF No. 29-4.)

11      At the opening of the trial, defense counsel informed the court that because the

12  court had denied him a continuance to secure Edwards' presence at trial, he had

13  determined that he could elicit testimony similar to how Edwards would have testified

14  from Steven Rock. (Exh. 75 at 7, ECF No. 35.5.) At trial, as recounted above, while

15  Rock did express that he personally would not have a student stay over at his home, he

16  also described heavy involvement by the staff with many aspects of the students' lives

17  outside of school. (Exh. 80 at 52-73, ECF No. 35-10.) He said that he himself visited

18  students living in weekly motels. Rock was familiar with teachers at Paradise at the time

19  who were a married couple and had taken two siblings into their home. Rock said he

20  was not sure if the boys actually lived with the couple and described it as "probably a

21  similar situation as what [McCallister] did, just two needy brothers that they took in." (*Id.*

22  at 73.) In his observation McCallister gave J.B. guidance in a "big brother" role. Rock

23  viewed McCallister's and J.B.'s interactions positively. Nothing ever suggested to him

that McCallister ever had any inappropriate relationship or contact with J.B. or any other student. He emphasized that McCallister was proactive and exceptional in Rock's classroom, was one of the best classroom assistants he'd ever had, and that he'd never had any complaints about McCallister.

School psychologist Kim Bozek also testified that McCallister had a big-brother type relationship with J.B. (Exh. 80 at 30-52, ECF No. 35-10.) She said teachers were very involved in the students' lives and frequently acted in the manner of a parent when trying to educate and provide guidance for the kids. She never had any indication that McCallister had any inappropriate interaction with J.B. or any other student.

McCallister sought an evidentiary hearing in this federal case; one document he wished to present was an affidavit by Carolyne Edwards as to how she would have testified had she been called at his trial. (ECF No. 71 at 7-8; ECF No. 30-1, Exh. 29, Decl. Carolyne Edwards.) This court denied McCallister's motion as to the Edwards' declaration because the Nevada Supreme Court had already adjudicated the claim on the merits in McCallister's first state postconviction petition. But even if this court was able to consider the declaration, it is cumulative of parts of Rock's and Bozek's testimony. Edwards states in the declaration that she had hired McCallister as an aide at Paradise, he was an excellent employee, and she firmly believed he was innocent of the charges. She states that many Paradise students were at-risk and came from unstable homes, and the teachers were very involved in all aspects of the students' lives. She states it was not unusual for students to go home with teachers. Rock and Bozek provided similar testimony at trial. Trial counsel is not ineffective for failing to introduce cumulative evidence. Edwards' declaration can fairly be described as more

1  supportive of McCallister than Rock's and Bozek's testimony taken as a whole. But

2  McCallister cannot show a reasonable probability of a different outcome at trial had

3  Edwards testified. McCallister has not demonstrated that the Nevada Supreme Court's

4  decision was contrary to or involved an unreasonable application of *Strickland*. 28

5  U.S.C. § 2254(d). The court denies ground 2.2.1.

6        ***Ground 2.2.2 is procedurally barred from federal review***

7        McCallister acknowledges that ground 2.2.2—his claim that trial counsel

8  ineffectively failed to investigate available witness Lois Johnson—is procedurally

9  defaulted. (ECF No. 48 at 16-19.) He insists he can show good cause and actual

10  prejudice to overcome the default of these claims under *Martinez v. Ryan,* 566 U.S. 1

11  (2012). To establish cause under *Martinez*, a petitioner needs to show "that he had no

12  counsel during his state collateral review proceeding or that his counsel during that

13  proceeding was ineffective under the standards of *Strickland v. Washington*." *Rodney v.*

14  *Filson*, 916 F.3d 1254, 1259 (9th Cir. 2019); *see also Martinez*, 566 U.S. at 14.

15  McCallister also needs to establish prejudice. He can satisfy the prejudice standard by

16  showing his defaulted claim is "substantial," that is that is that it has "some merit."

17  *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013). McCallister had state

18  postconviction counsel, thus he must show that "there was a reasonable probability that,

19  absent the deficient performance [of state postconviction counsel], the result of the

20  postconviction proceedings would have been different." *Runningeagle v. Ryan*, 825

21  F.3d 970, 982 (9th Cir. 2016) (internal citations omitted).

22        Respondents urge that McCallister cannot overcome the presumption that

23  postconviction counsel is presumed to have exercised reasoned professional judgment

1   in litigating his first state habeas petition. (ECF No. 66 at 29-34.) Respondents further

2   point to the fact that state postconviction counsel successfully argued that the statute of

3   limitations barred the lewdness charges, resulting in the dismissal of 13 lewdness

4   counts.

5          But this court need not consider whether state postconviction counsel was

6   ineffective, because ground 2.2.2 is not substantial. The state courts considered and

7   rejected McCallister's claim that trial counsel ineffectively failed to call Carolyne

8   Edwards to testify as to the school's culture, staff's heavy involvement with many

9   aspects of students' lives apart from academia, McCallister's excellent, professional

10  work, and her belief in his innocence. McCallister's description of how Johnson would

11  have testified is remarkably similar to Edwards' proffered testimony. (*See* ECF No. 69 at

12  32-33.) The Nevada Supreme Court already rejected the trial counsel ineffective-

13  assistance claim for failing to investigate Edwards and have her testify. That court held

14  that McCallister could not show prejudice for failing to present her cumulative testimony.

15  McCallister argues that the claim related to Johnson is substantial because: "Ms.

16  Johnson's testimony would have been critical to putting McCallister's actions into

17  context and undermined the State's allegations that McCallister paid for J.B.'s hobbies

18  and invited J.B. to sleep at his residence as guise to prey on J.B." (*Id.* at 35.)

19  McCallister argues that neither Bozek nor Rock testified that staff were generous to the

20  kids and helped provide basic necessities and other support, but this is belied by the

21  record. The two witnesses also acknowledged that one couple who taught at Paradise

22  ultimately took in and adopted either one student or two siblings.[9] McCallister has not

23  _____

[9] The court notes that nothing in Edwards' or Johnson's declarations as to how they would
testify suggests that McCallister's actions of taking J.B. to live with him for essentially 3 years

shown that there's a reasonable probability of a different outcome had trial counsel

called Johnson to testify. Accordingly, McCallister has not demonstrated good cause

and actual prejudice to overcome the default of ground 2.2.2. Ground 2.2.2 is dismissed

as procedurally barred from federal habeas review.

**Ground 2.3**

McCallister alleges that trial counsel was ineffective for introducing uncharged

allegations. (ECF No. 27 at 58.) In his opening statements, defense counsel addressed

the national park camping trip. No charges were based on any events on that trip.

> J.B. will tell you about this camping trip they took. J.B. thinks it was
> to Yellowstone National Park, it was actually Zion National Park. They
> went up there with [McCallister's] sister and her husband. J.B. will tell
> you that during the course of this trip—they only stayed one night. During the
> course of this trip that [McCallister] abused him in the back of the pickup
> truck. Well you'll hear from [McCallister's] sister that they all slept in the
> same tent. Nobody was in the back of the pickup truck. That she had
> woken up a couple—that his sister had woken up a couple times during
> the course of the night and everybody was sleeping. Nobody was ever in
> the back of the pickup truck.

(Exh. 79 at 30, ECF No. 63-3.)

McCallister's sister, Tina Crawford, testified that she and her husband would

attend hockey games with McCallister and J.B. (Exh. 79 at 158-171, ECF No. 35-10)

She lived out of state part of the time period when McCallister spent a lot of time with

J.B., and she estimated that she spent time with them on about 10 occasions. She

never had any indication of any inappropriate behavior. She testified that the 4 of them

camped at Zion National Park for one night over Memorial Day weekend in 1997. They

all traveled in McCallister's GMC truck, and they all slept in a 6-person tent that her

---

straight were common or would have been viewed as common and just part of the caretaking
culture at Paradise. (*See* Exh. 29, ECF No. 30-1; Exh. 30, 30-2.)

husband had purchased. It was very cold with snow on the ground. Crawford woke McCallister up in the tent and asked for the truck keys because she needed to get warm. She and her husband went into the truck for a few hours until daylight.

The Nevada Supreme Court held that counsel's impeachment strategy was not unreasonable:

> McCallister argues that trial counsel should not have introduced evidence of an uncharged act of sexual assault. Based on counsel's opening statement at trial, it is clear that the strategy behind introducing this evidence was to impeach the victim's credibility. As the State's case relied heavily on the victim's credibility, McCallister has not demonstrated that counsel's strategy to impeach the victim's credibility fell below an objective standard of reasonableness. *See Vaca v. State*, 314 S.W.3d 331, 335 (Mo. 2010) (holding counsel was not ineffective in introducing evidence of uncharged misconduct as trial strategy); *State v. Bedell*, 322 P.3d 697, 703-04 (Utah 2014) (same); *see also Lara*, 87 P.3d at 530.

(Exh. 15 at 5-6, ECF No. 29-4.)

The State did rely heavily on the jury crediting J.B.'s testimony. Defense counsel aimed to damage J.B.'s credibility by highlighting inconsistencies in his accounts of events over the years. Counsel elicited testimony about J.B.'s chaotic and unstable family life and living situation and sought to show that J.B. was deceitful and manipulative. Defense counsel elicited testimony from McCallister's girlfriend Dixon that J.B. could be angry, explosive, manipulative, and would lie to get his way. (Exh. 80 at 28, ECF No. 35-10.) While it may be that the jury would question the motives of McCallister's sister, she also testified clearly and specifically about a night out camping, when she was a married adult, and contradicted J.B.'s version of events. McCallister has not shown that his counsel's strategy to impeach J.B.'s credibility was unreasonable. McCallister has not demonstrated that the Nevada Supreme Court's

1  decision was contrary to or involved an unreasonable application of *Strickland*. 28

2  U.S.C. § 2254(d). The court denies ground 2.3.

3    **Ground 2.4**

4    McCallister asserts that trial counsel failed to reasonably cross-examine the

5  victim. (ECF No. 27 at 59-62.) He argues that counsel was ineffective for questioning

6  about his grades and the camping trip, and not asking him about his ADHD medications

7  and an alleged false memory. He also contends that defense counsel created confusion

8  by questioning J.B. about what proved to be merely a transcription error in his police

9  statement. The Nevada Supreme Court, noting that McCallister did not argue that he

10  was prejudiced, held that he did not demonstrate that counsel's strategy in cross-

11  examination fell below an objective standard of reasonableness. (Exh. 15 at 6, ECF No.

12  29-4.)

13    Defense counsel questioned J.B. about his failing grades, which could

14  reasonably, strategically tie in with Dixon's testimony that J.B. lied to get his way,

15  including lying about his bad grades so that he could continue to play hockey. Counsel

16  had to elicit the testimony that McCallister abused J.B. while on the Zion camping trip in

17  order to contrast it with McCallister's sister's account of the trip. McCallister now makes

18  the bare assertion that his trial counsel should have questioned J.B. about taking ADHD

19  medication and Adderall because it "may" cause hallucinations and other side effects

20  that could impair his recall. (ECF No. 27 at 61.) That speculation is wholly insufficient to

21  show that counsel was deficient. The alleged false memory involved an alleged trip to

22  Lake Tahoe that J.B. apparently recalled. McCallister maintained that no trip to Lake

23  Tahoe occurred. But McCallister's only support appears to be his own statement or

affidavit. (*See* ECF No. 27 at 61, n. 286.) The cross-examination admittedly becomes confusing because defense counsel tries to show that J.B. told the police about someone named Chad, but then testified at the preliminary hearing that he didn't know a Chad. (Exh. 79 at 109-110, ECF No. 79-15.) It turned out to be a transcription error, which the State clarified on re-direct. (*Id.* at 121-122.) McCallister's counsel for the preliminary hearing had made the same mistake. The gaffe sowed some momentary confusion, but it did not make the cross-examination of J.B. unreasonable as a whole. McCallister has not shown a reasonable probability of  a different outcome at trial. McCallister has not demonstrated that the Nevada Supreme Court's decision that McCallister failed to show deficiency or prejudice with respect to his counsel's cross-examination of the victim was contrary to or involved an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 2.4.

**Ground 2.5**

McCallister argues that trial counsel failed to object to testimony by Bozek and Rock as crossing the line into improper expert testimony. (ECF No. 27 at 62-63.)

The Nevada Supreme Court disagreed that they were proffered as expert witnesses:

> McCallister argues that trial counsel should have objected to testimony by the school psychologist and another teacher as to whether either had hosted a student overnight on the ground that it was improper expert testimony. These witnesses testified based on their own perceived experiences, not based on scientific, technical or other specialized knowledge. They therefore testified as lay witnesses, not as expert witnesses. *Compare* NRS 50.265 *with* NRS 50.275. As the testimony was admissible, counsel was not deficient in failing to raise a futile objection. *See Ennis v. State*, 706, 137 P.3d 1095, 1103 (Nev. 2006).

(Exh. 15 at 6, ECF No. 29-4.)

As discussed above, Bozek testified that she worked as a teacher at Paradise with McCallister. She expressed that McCallister worked hard and was dedicated to helping and deeply cared about the kids. She said that she had never had a student stay overnight at her house and in her personal opinion it was not appropriate to have students stay at the home of teachers or staff. Rock praised McCallister's work in his classroom as exceptional. He said he learned that as an educator it crossed a line to have students stay at your house and was inappropriate. Rock testified that he had never had a student stay over at his home. Both testified to their personal experiences with McCallister when they were teachers at Paradise, not as expert witnesses. Their specific comments about whether they thought it was appropriate for students to stay over at the homes of teachers or staff countered McCallister's narrative about the culture at Paradise. Both also acknowledged that they knew of the situation where the married couple who taught at Paradise took in students, apparently ultimately adopting them. The claim that either Bozek or Rock proffered expert testimony is meritless.[10] Their testimony was not based on any scientific, technical or other specialized knowledge. Defense counsel was not ineffective for failing to lodge a futile objection that

_____

[10] NRS 50.265 provides: If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

1.   Rationally based on the perception of the witness; and

2.   Helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.

NRS 50.275 states: If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.

either witness improperly testified as an expert. *Morrison v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992); *see also Rupe*, 93 F.3d at 1445. Because McCallister failed to show that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of *Strickland*, the court denies habeas relief as to ground 2.5.  28 U.S.C. § 2254(d).

**Ground 2.6**

McCallister contends that trial counsel was incapable of effectively representing him due to brain damage. (ECF No. 27 at 63-64.) State postconviction counsel argued on appeal that trial counsel was ineffective because he'd suffered a traumatic brain injury decades before the trial in a ski accident. (Exh. 13 at 20-21, 42-43, ECF No. 29-2.) Counsel pointed to Dr. Mortillaro's psychological and neuropsychological testing of trial counsel and his testimony in trial counsel's tax evasion trial, which occurred 2 years after McCallister's trial. McCallister presented the doctor's findings and diagnoses in his appeal of the denial of his first state postconviction petition. (*Id.*) In that appeal, McCallister says that psychological and neuropsychological testing revealed that his trial counsel had frontal lobe damage and that people with that damage "have lapses in logic and do things that, you know, appear to be ignorant or stupid or just unfounded" and "have a very difficult time coping with stress." (*Id.* at 21.)

The Nevada Supreme Court concluded that nothing in the record indicated counsel performed deficiently or that McCallister was prejudiced:

> McCallister argues that trial counsel should have withdrawn due to counsel's preexisting brain injury and prosecution as the target of a tax investigation. McCallister has not identified and the record does not indicate any effect that counsel's personal issues had on his performance in this matter, and thus McCallister has not shown deficient performance or prejudice.

(Exh. 15 at 5, ECF No. 29-4.)

A petitioner must demonstrate that counsel made specific errors as a result of extrinsic circumstances (such as the alleged brain injury here). *See U.S. v. Cronic*, 466 U.S. 648, 658 (1984) ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). The extrinsic circumstances must cause counsel to make strategic decisions "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

At issue with a claim of ineffective assistance of trial counsel is how counsel's actions or inactions were deficient and whether such deficiency prejudiced a petitioner. The question of what may have caused or contributed to counsel's failure to render effective assistance is immaterial. The court has already determined in this order that McCallister has failed to show that trial counsel was deficient or that he suffered prejudice. So McCallister cannot show that trial counsel was unable to effectively represent him due to brain damage. He has not demonstrated that the Nevada Supreme Court's decision was contrary to or involved an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d). The court therefore denies relief as to ground 2.6.

**Claims of Cumulative Error**

McCallister argues in ground 5 that the cumulative effect of trial errors violated his Fifth, Sixth, and Fourteenth Amendment due process and fair trial rights. (ECF No. 27 at 75-76.) In ground 2.7 he contends that he suffered prejudice from the cumulative effect of trial counsel's ineffectiveness. (ECF No. 27 at 64-65.)

The combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290 n.3. In determining whether the combined effect of trial errors violated a defendant's due process rights the inquiry is whether the errors rendered the criminal defense "far less persuasive," and thereby had a "substantial and injurious effect or influence" on the jury's verdict. *Parle*, 505 F.3d at 928 (citing *Chambers*, 410 U.S. at 294); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Affirming his convictions on direct appeal, the Nevada Supreme Court rejected the cumulative error claim:

> This court will not reverse a conviction unless a defendant's constitutional right to a fair trial was violated by the cumulative effect of errors, even if individual errors are harmless. *Rose v. State*, 163 P.3d at 419. In examining whether cumulative error warrants a reversal, this court considers: "'(1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged.'" *Id.* (quoting *Mulder v. State*, 992 P.2d 845, 854-55 (Nev. 2000)). In addition to the serious nature of the crimes charged, we determine that the State presented ample evidence of McCallister's guilt and that McCallister's assignments of error are meritless. As a result, we conclude that McCallister's cumulative error challenge is unavailing.

(Exh. 8 at 10, ECF No. 28-8.)

The Nevada Supreme Court concluded in affirming the denial of his first state postconviction petition in part that McCallister had not demonstrated any other

40

1   instances of counsel's deficiency apart from the issue of the statute of limitations for the

2   lewdness charges:[11]

> While it is unclear whether multiple deficiencies in counsel's
> performance may be cumulated for purposes of demonstrating prejudice,
> *see McConnell v. State*, 212 P.3d 307, 318 n.17 (Nev. 2009), McCallister
> has identified only one deficiency, for which a remand is warranted. One
> instance of deficient performance cannot be cumulated.

6   (Exh. 15 at 7, ECF No. 29-4.)

7   McCallister prevailed on his claim in his first state postconviction petition that his

8   trial counsel was ineffective for failing to challenge the lewdness charges based on the

9   statute of limitations. But he has not demonstrated other errors, so there are not multiple

10  errors to cumulate. The court therefore denies relief as to ground 5—that the cumulative

11  effect of trial errors violated his due process and fair trial rights. The court also denies

12  relief as to ground 2.7—that the cumulative effect of trial counsel's ineffectiveness

13  violated his right to effective assistance of counsel.

14  The petition is therefore denied in its entirety.

15  ### V.   Certificate of Appealability

16  This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules

17  Governing Section 2254 Cases requires this Court to issue or deny a Certificate of

18  Appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within

19  the Petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v.

    Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

20

21

_____

22  [11] As explained earlier in this order, the Nevada Supreme Court remanded McCallister's state
    postconviction habeas petition for the district court to consider whether his counsel was ineffective

23  for failing to raise a statute of limitations defense to the lewdness charges. The State then
    dismissed the lewdness charges, and the district court entered an amended judgment of
    conviction. (*See* Exh. 15, ECF No. 29-4, Exh. 23, ECF No. 29-12.)

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating McCallister's petition, the court finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a certificate of appealability for its resolution of McCallister's petition.

## VI.    Conclusion

It is therefore ordered that the second amended petition (ECF No. 27) is **DENIED**.

It is further ordered that a certificate of appealability will not issue.

The Clerk of the Court is directed to:

- substitute Jeremy Bean for respondent Brian Williams;

- enter judgment accordingly and close this case.

DATED: July 3, 2024.

_____
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE